IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHARLENE L. MINES, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| | Civil Action |
| v. | No. 14-2792 (JBS) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | **OPINION** |
| Defendant. | |

APPEARANCES:

Richard Lowell Frankel, Esq.
BROSS & FRANKEL, PA
102 Browning Lane, Bldg C-1
Cherry Hill, NJ 08003
     Attorney for Plaintiff

Melissa Kay Curry
Special Assistant U.S. Attorney
Social Security Administration
Office of the General Counsel, Region III
P.O. Box 41777
Philadelphia, PA 19101
     Attorney for Defendant Commissioner of Social Security
     Administration

**SIMANDLE, Chief Judge:**

**I. INTRODUCTION**

In this case, Plaintiff Charlene Mines seeks review under 42 U.S.C. §§ 405(g) of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for Disability Insurance Benefits under Title II of the Social Security Act ("Act"). 42 U.S.C. §§ 401-434. Plaintiff

suffers from back pain, neck pain with radiation to her arms and hands, right ankle pain, vertigo, depression, and anxiety, and was denied disability benefits for the period beginning April 1, 2010, the alleged onset date of disability, to October 23, 2013, the date on which the Administrative Law Judge ("ALJ") issued a written decision in her case.

Plaintiff argues that the ALJ erred in erred in finding that her right ankle disorder and mental disorders were not severe; in failing to consider her non-severe impairments, specifically her right ankle impairment, mental disorders, vertigo, and upper extremity limitations, in determining Plaintiff's residual functional capacity; and in failing to perform a function-by-function analysis. Because the Court finds that the ALJ failed to properly evaluate Plaintiff's right ankle disorder in the residual functional capacity assessment and failed to perform a function-by-function analysis, the Court will remand the case to the Commissioner of Social Security to reconsider Plaintiff's request for Disability Insurance Benefits.

II.  **BACKGROUND**

   **A. Procedural History**

   Plaintiff Charlene Mines filed an application for Disability Insurance Benefits ("DIB") on October 20, 2011, alleging an onset of disability date of April 1, 2010. (R.

2

[Docket Item 5] at 102.) Her claim was denied by the Social Security Administration on February 9, 2012. (R. at 177-79.) After Plaintiff's application for reconsideration was also denied, she appeared before an Administrative Law Judge ("ALJ") on September 12, 2013, for a hearing. The ALJ issued an unfavorable decision on October 23, 2013, finding that although Plaintiff had disorders of the lumbar and cervical spine that were considered "severe," she did not qualify for disability benefits because she could still perform her past work as a daycare worker. (ALJ Opinion [Docket Item 5-2], R. at 102-110.)

Plaintiff's request for review of the ALJ's decision was denied (R. at 1-3), and she timely filed this action. The Court has jurisdiction to review the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

**B. Medical History**

The following facts are relevant to the present motion. Plaintiff was 51 years old at the time of the hearing date and had been working part-time providing childcare services from her home since 2010. She has worked in childcare for over 15 years. She suffers from back pain, neck pain with radiation to her arms and hands, right ankle pain, vertigo, depression, anxiety, and some problems with memory and focus. (R. at 120-21.)

**1. Plaintiff's 2010-2011 medical history**

On March 30, 2010, Plaintiff was examined at Sunset Road Medical Associates for a lump on the back of her neck. The doctor concluded that she had a possible cyst or abscess and referred her to a surgeon. (R. at 321.)

On February 21, 2011, Plaintiff went back to Sunset Road Medical Associates for an evaluation of her foot and for decreased hearing after she suffered a fall three days earlier. The doctor indicated that she may have a fracture in her left ankle. (R. at 318.) Approximately three weeks later, on March 15th, Plaintiff went back for an examination because she still had some pain in her foot and was prescribed a walking boot. (R. at 319.)

That same day, Plaintiff also saw a neurologist, Dr. Timothy Dunn. Dr. Dunn noted that Plaintiff recently had a CT scan of her head, which "showed some hypodensity near the internal capsule" but was otherwise normal. (R. at 324.) Dr. Dunn also noted that she had some "mild sensory abnormalities of the median nerve" but had an "otherwise normal nerve conduction study." (Id.) Dr. Dunn prescribed Neurontin and Ultram and ordered further diagnostic testing to rule out MS. (Id.)

Plaintiff subsequently had an MRI on September 12, 2012, which showed no significant abnormality.

### 2. State agency consultative exams and reviews

#### a. Dr. Gregory Maslow

4

Plaintiff was examined by several physicians in early 2012 in connection with her October 2011 application for disability benefits. On January 24, 2012, Plaintiff completed a state orthopedic consultative exam by Dr. Gregory Maslow. At the time, she complained of neck pain and stiffness, numbness and tingling in both hands, low back pain, and tingling in her feet. She also stated that she had fallen and suffered a fracture in her left foot "relatively recently." (R. at 329.)

Dr. Maslow diagnosed Plaintiff with chronic lumbar strain and chronic degenerative disc disease at the cervical spine. (R. at 331.) He noted that she had normal balance and gait and was able to stand on her toes and heels. In an overhead exercise test, Plaintiff tested negative for thoracic outlet impingement signs and symptoms. (R. at 330.) She had a full range of motion in her elbows, forearms, and wrists bilaterally, with no evidence of tendonitis, synovitis, or instability. A neurological examination of the upper extremities was normal. Dr. Maslow also noted that Plaintiff's reflexes were normal, strength testing in her upper extremities was normal, and her grip strength and pinch grip were both excellent. (Id.)

With respect to Plaintiff's lower extremities, Plaintiff had a normal range of motion for her hip, knee, and both ankles. (Id.) Dr. Maslow found no evidence of synovitis or instability at Plaintiff's ankles and noted that a neurologic examination

5

showed that straight leg raising caused low back pain but no leg signs or symptoms. (R. at 331.) Plaintiff's reflexes were intact and strength testing was normal throughout. (Id.)

Dr. Maslow concluded that there was no objective evidence of a neurological deficit. (Id.)

### b. Dr. Kenneth Goldberg

Plaintiff had a psychiatric evaluation with Dr. Kenneth Goldberg a few days later on January 27, 2012, as part of a state consultative mental status exam. Plaintiff reported to Dr. Goldberg that she "is not depressed during the day, when she takes care of children, but by the end of the day, she feels bad, noting she is in a lot of physical pain." (R. at 337.) She stated that she "has happiness in her life" and "tends to get happy when other people are happy." (Id.) She also stated that she "tends to be an emotional person" and experiences fatigue. Dr. Goldberg noted that Plaintiff became tearful when asked if she liked herself and broke down when she mentioned her family of origin. (Id.) Plaintiff reported having a "fairly busy" life between running her daycare center, trying to keep up with her house, and spending time with her boyfriend. (R. at 338.) She reported that she was limited in what she does "because of the pain, not because of her mood." (R. at 337.)

Plaintiff stated that she had panic attacks about the pain she is in about once or twice a week. (R. at 337.) She has

6

trouble sleeping, mostly because of the pain, but does not have nightmares. (Id.)

Dr. Goldberg observed that Plaintiff was nervous and fairly emotional but that she related very well, had average speech pace, a lucid and logical thought process, and was goal oriented. (R. at 337.) With respect to intellectual functioning, Plaintiff retained six digits forward and two digits backward. She retained three out of three words immediately and one word after five minutes. Plaintiff could not do serial sevens and misspelled the word "WORLD" backwards.

`     Dr. Goldberg concluded that Plaintiff's "prospects, with regard to her mental health, are good." He stated that Plaintiff "is a sensitive person, who reacts with emotions, but is not mentally ill." Dr. Goldberg noted that Plaintiff had "some depressive traits" and diagnosed her with dysthymic disorder. Her GAF score was 65. (R. at 339.)

        c. Dr. Jane Shapiro and Dr. Arthur Pirone

Dr. Jane Shapiro, a non-examining consultative psychologist, reviewed Plaintiff's medical records and completed a Psychiatric Review Technique Form on February 8, 2012. She concluded that Plaintiff's affective disorders created mild restrictions in Plaintiff's daily living activities, mild difficulties in maintaining social functioning, and moderate

difficulties in maintaining concentration, persistence or pace. (R. at 155.)

Dr. Arthur Pirone conducted a residual functional capacity (RFC) assessment. He determined that Plaintiff could occasionally lift and/or carry 50 pounds and could frequently lift and/or 25 pounds of weight. He also concluded that Plaintiff could sit, stand, and/or walk about six hours in an eight hour workday. He noted that Plaintiff's push/pull functionings were unlimited. (R. at 157.) Dr. Pirone noted the following impairments: DDD/Spondylosis of the cervical spine; tendinosis in the right shoulder; mildly abnormal EDS of upper extremities, and a healed fracture in the left 5th metatarsal. (Id.) He concluded that Plaintiff had no postural, manipulative, or environmental limitations. (Id.)

### d. Dr. Ellen Gara and Dr. Seung Park

On reconsideration, Plaintiff's records were reviewed by non-examining consultative psychologist Dr. Ellen Gara. Like Dr. Shapiro, Dr. Gara concluded that Plaintiff's affective disorders created mild restrictions in Plaintiff's daily living activities, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. (R. at 168.)

Dr. Seung Park conducted an RFC assessment on June 12, 2012. His assessment of Plaintiff's capacity to lift/carry, sit,

8

stand, and/or walk, push and/or pull was consistent with the
opinion of Dr. Pirone. (R. at 169-70.)

### 3. Vertigo

Plaintiff saw Dr. Rasesh Shah in April of 2012 for an
examination of her hearing loss and vertigo. Dr. Shah noted that
Plaintiff's symptoms were "moderate in nature" and a physical
examination was within normal limits. (R. at 419.) Plaintiff was
found to have normal sloping to moderately severe bilateral
sensorineural hearing loss. (Id.) Dr. Shah ordered an ENG and
found no issues with Plaintiff's ocular motor function, but
noted that she had issue with postural stability, which "may be
contributing to her vertiginous episodes." (Id.)

### 4. Mood disorders

Plaintiff began treatment at Twin Oaks Community Services
on November 8, 2012, and was diagnosed with adjustment disorder
with chronic, depressed mood. (R. at 359.) She was seen by Dr.
Danielle Dunn. Plaintiff noted to the doctor that she "began
experiencing pain when she was 39 years old. The pain has
decreased her ability to work. Since the pain began she has been
feeling depressed, experiencing increased appetite & decreased
sleep." (R. at 366.) In the Discharge/Transfer Summary form, Dr.
Dunn wrote, that Plaintiff had "referred herself due to back
pain, physical health problems, and mild depression. She reports
that she believes she would not be depressed if she did not have

9

pain or financial issues." (R. at 360.) She was recommended to attend biweekly sessions focused on depression but stopped treatment on January 3, 2013 due to financial difficulties. (R. at 360.)

### 5. Ankle pain

Plaintiff attended Strive Physical Therapy twice a week for four weeks from October 9, 2012 to November 12, 2012 after complaining of unsteadiness and balance deficits. The physical therapy notes indicate that Plaintiff "presented symptoms consistent with gait dysfunction" and "balance deficits on uneven surfaces." (R. at 391.) The last treatment note, dated November 9, 2012, states that Plaintiff had "limited tolerance to treatment program," and complained of "increased LBP and LE fatigue/'shakiness' during exercise completion." (R. 418.)

Plaintiff then "rolled her [right] ankle" in March 2013 and went to Lourdes Medical Associates for an examination by Dr. Sean McMillian. Dr. McMillian noted that Plaintiff had a decreased range of motion, hypermobility with supination, and swelling and pain in her ankle. (R. at 357.) An X-ray revealed a healed partially fractured tip of the lateral malleolus but no acute fracture, soft swelling tissue, or dislocation of the ankle. (R. at 355, 357.) Dr. McMillian diagnosed Plaintiff with chronic right ankle sprain and recommended anti-inflammatories and a walking boot. (R. at 357.)

Plaintiff went back to Strive Physical Therapy on April 9, 2013, for another four weeks of physical therapy. The initial evaluation notes state that Plaintiff "is limited in her tolerance for standing, walking, performing stairs and performing ADLs such as shopping and driving. She also presents with a complicated PMH which may prolong her recovery, as well as with L foot pain which limits her WB tolerance." (R. at 392.) Plaintiff reported to the physical therapist that she had two falls in the past year. (R. at 394.) Treatment notes from April 23rd notes that Plaintiff had decreased swelling and improved range of motion to her right ankle, but continued to have some weakness on her right side, which limited her balance with activity such as walking and ADLs that require standing. (R. at 402.) The last two sets of treatment notes, dated April 25th and April 29th, 2013, state that Plaintiff made some improvements to the range of motion in her right ankle but still had strength and balance deficits on her right side which "limit her ability to ambulate specially on uneven surfaces" as well as her ability to ascend and descend stairs without difficulty. (R. at 403, 405.) Plaintiff reported "soreness" in her ankle on April 15th but reported that her ankle was "feeling better" on April 18th and April 23rd. (R. at 400-02.) On April 25th, she stated that she feels like her ankle "is going to give out sometimes." (R.

at 403.) On the last day of therapy, April 29th, she stated that her "ankle has been feeling pretty good." (R. at 405.)

In May 2013, shortly after concluding physical therapy, Plaintiff went back to Lourdes Medical Associates for a visit with Dr. McMillian, complaining of persistent instability with her right ankle and noting that she was having increasing falls which she did not attribute to the ankle itself. (R. at 383.)

Dr. McMillian conducted a physical exam which revealed an antalgic gait, hypersupination in Plaintiff's right ankle and pain along the anterior talofibular ligament which Dr. McMillian characterized as "of a minimal nature." (R. at 383.) Plaintiff was diagnosed with chronic right ankle sprain with what appears to be overlying cervical radiculopathy. (Id.)

### 6. Neck, back, and arm-related pain

On May 22, 2013, Plaintiff saw Dr. Lee Buono for an evaluation of her neck and back pain and pain in her arms. With respect to Plaintiff's upper extremities, Dr. Buono noted that her upper extremity motor strength is 5/5 with all muscle groups, including deltoid, biceps, triceps, and hand intrinsics bilaterally. (R. at 354.) There was a "slight weakness in her left brachioradialis at 4+/5." (Id.) With respect to Plaintiff's lower extremities, Dr. Buono observed that Plaintiff had "5/5 strength in all muscle groups." She had a "mildly antalgic gait." (Id.)

12

Dr. Buono noted that Plaintiff had a spondylotic disc herniation, and has had the condition for many years. He informed Plaintiff that her condition will not change and gave her the option of surgery. (Id.)

### C. Plaintiff's Testimony

Plaintiff testified at a hearing before the ALJ on September 12, 2013. She testified that she has run a daycare center from her home for the past 25 years and that she currently takes care of one to two children several days a week. (R. at 122-23.) She provides games for the children but does not play with them as much as she used to. (R. at 125.) She does not need to dress the children, and microwaves dinner for them rather than cook. (Id.)

According to Plaintiff, she feels burning and pain in her neck which radiates down both arms to her hands. She reported having tingling and numbness in her feet, which she believes contributes to her problems falling. (R. at 126-27.) She has weakness and a "dull, aching pain" in her lower back. (R. at 128.) She stated that her right ankle sometimes becomes weak and she will fall; she has fallen on her right ankle twice and her left foot once. (R. at 130-31.) Plaintiff has bouts of vertigo a couple of times a day where she will feel dizzy for approximately five minutes and will need to grab onto something. (R. at 132-33.)

Plaintiff testified that when she drives, she suffers from pain in her neck, arms, and hands, and she mostly drives locally. (R. at 121.) She also testified that she gets back pain when she performs daily activities like showering, talking on the phone, cooking, and walking around. She stated that she could probably walk a block, but would be afraid that she wouldn't be able to make it back. (R. at 130.) She noted that she has ankle pain on and off every day, and needs to hold onto something when she walks up and down stairs. (R. at 131.) She states that she starts to feel pain in her ankle within 10 to 20 minutes of walking. (R. at 131.) She can sit for as much as an hour but will feel pain everywhere and will need to lie down. (R. 132.) She testified that she is unable to do household chores like cleaning, cooking, and laundry, although she is able to go shopping alone. (R. at 139-40.)

When asked about her depression and anxiety, Plaintiff stated that she was having a hard time dealing with her health issues. (R. at 134.) She does not avoid people and does not take medication for her anxiety or depression. (R. at 136-37.) She stated that she felt unsafe going out and doing activities because of her physical problems. (R. at 136.) She also testified that on most days, she forces herself to get up at 8:00 in the morning. She has some problems with focus and concentration because she can't sit still. (R. at 137-38.)

14

At the hearing, a vocational expert testified that Plaintiff's previous job would be classified as a daycare worker with light exertion, a semi-skilled position with a Specific Vocational Preparation (SVP) rating of 4. (R. at 143.) The expert also noted that if Plaintiff were to be considered the director of a daycare center, her past work would be classified as sedentary and skilled with an SVP level of 7. (R. at 145.)

**D. The ALJ Decision**

The ALJ issued a written opinion on October 23, 2013, determining that Plaintiff was not disabled from April 1, 2010 through the date of the decision. (R. at 110.) He found that Plaintiff's disorder of the lumbar and cervical spine was a severe impairment, but that Plaintiff's disorder of the ankles and Plaintiff's mood disorders were not severe. (R. at 104.) He found that Plaintiff had the residual functional capacity (RFC) to perform her previous job as a daycare worker. (R. at 109-10.)

Specifically with respect to Plaintiff's ankle, the ALJ explained,

> The claimant alleged instability within her right ankle and reported frequent falls; however, physical examinations of record do not reveal instability and show normal gait, full motor strength, and full range of motion. Further, the claimant did not seek treatment for frequent falls from her primary physician and did not seek emergency room treatment for falls. Physical therapy records from 2012 indicate that claimant denied falling.

(R. at 104.)

With respect to Plaintiff's affective disorders, the ALJ noted that while Plaintiff had a mild limitation in concentration, persistence, or pace, Plaintiff reported no limitation in social functioning and had no difficulty getting along with others. (R. at 105.) He concluded that Plaintiff's mental impairments "do not cause more than minimal limitations" in her ability to perform basic mental work activities and were therefore not severe. (R. at 104-05.)

In determining that Plaintiff had the RFC to perform light work, the ALJ examined Plaintiff's records of treatment and the opinions of several physicians. He concluded that Plaintiff's impairment could reasonably be expected to cause her symptoms, but that her testimony about the severity of her impairments was not supported by the medical record. (R. at 107.) With respect to Plaintiff's back, the ALJ noted that treatment has been "routine and conservative" since the alleged onset date, and that EMG and MRI tests showed mostly normal results and only mild disc disease and mild degenerative changes and sensory abnormalities. (R. at 107.) Similarly, physical exams revealed decreased reflexes and pin sensations in the left upper extremity, and decreased reflexes in the knee and ankle, but mostly normal functioning. (R. at 107-08.)

Citing to Dr. Maslow's report, the ALJ noted that Plaintiff's overhead exercising testing was negative for

16

thoracic outlet impingement, there was a full range of motion
and no evidence of instability in her shoulders and upper
extremities, her grip strength was excellent bilaterally, and
strength testing was normal. (R. at 108.)

The ALJ stated that Plaintiff attended Strive Physical
Therapy in 2012, and that Plaintiff "reported no improvement
with her alleged shakiness and unsteadiness; however, she
reported no falls and no difficulty with her activities of daily
living, including showering, cooking, and standing activities of
daily living." (R. at 108.)

With respect to Plaintiff's ankle, the ALJ cited Dr.
Maslow's finding that there was no evidence of instability of
the ankle or knees, noted that the lower extremity examination
showed a full range of motion, and a neurological examination
showed no leg signs or symptoms. He also noted that strength
testing was normal. (R. at 108.) The ALJ gave significant weight
to Dr. Maslow's report, finding it "consistent with the medical
record, which shows mild diagnostic findings, full range of
motion, normal gait, and full strength." (Id.)

The ALJ also gave significant weight to Dr. Goldberg's
assessment of Plaintiff's mental health. He gave little weight
to the reports of Dr. Shapiro and Dr. Gara, stating that
Plaintiff does not receive mental health treatment and does not
take psychiatric medications. (R. at 109) He also stated that

17

Plaintiff "reported that she would not be depressed if she did not have pain and financial issues." (Id.)

After determining that Plaintiff had the RFC to perform light work, the ALJ found that Plaintiff was capable of performing past relevant work as a daycare worker or director. (R. at 109-10.) Accordingly, the ALJ found that Plaintiff was not disabled. (R. at 110.)

### E. Parties' Arguments

Plaintiff argues that the ALJ committed several errors and asks the Court to enter judgment awarding benefits to Plaintiff or, in the alternative, to remand the case. First, she contends that the ALJ erred in the RFC analysis by failing to perform a function-by-function assessment of her RFC, as required by Social Security Ruling 96-8p. (Pl. Br. [Docket Item 13] at 13.) She also argues that the ALJ erred in its determination that Plaintiff's ankle disorder and mood disorders were non-severe, and in not considering those impairments in the RFC. (Pl. Br. at 17.) Finally, she contends that the ALJ failed to consider Plaintiff's vertigo and limitations to her upper extremities when determining Plaintiff's RFC. (Pl. Br. at 23.)

Defendant argues that the ALJ's failure to perform a function-by-function analysis was not reversible error because he took all relevant evidence into consideration and the RFC assessment of light work was supported by substantial evidence.

(Def. Br. at 7, 12.) Defendant also argues that the ALJ properly evaluated Plaintiff's ankle disorder, affective disorders, cervical spine degenerative disease, and vertigo. (Def. Br. at 10.)

**III. STANDARD OF REVIEW**

This Court reviews the Commissioner's decision pursuant to 42 U.S.C. § 405(g) to determine whether substantial evidence supports the decision to deny Social Security benefits. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008). The substantial evidence standard is a "deferential standard of review," and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004) (internal quotations and citations omitted). It is less than a preponderance of the evidence but "more than a mere scintilla." McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004). If the ALJ's findings of fact are supported by substantial evidence, the reviewing court is bound by those findings, whether or not it would have made the same determination. Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001).

In order to allow for meaningful judicial review, the ALJ must set out a specific factual basis for each finding. Baerga v Richardson, 500 F.2d 309, 312-13 (3d Cir. 1974). The ALJ may choose which evidence to credit but must consider all the

evidence and give some reason for rejecting or discrediting
competent evidence. Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir.
1999). The Court may not weigh the evidence or substitute its
own conclusions for those of the ALJ. Chandler v. Comm'r of Soc.
Sec., 667 F.3d 356, 359 (3d Cir. 2011).

IV.  DISCUSSION

     A. Standard for Determining Disability

     To be eligible for disability insurance benefits, a
claimant must have a "medically determinable physical or mental
impairment" that prevents him from engaging in any "substantial
gainful activity" for a continuous twelve-month period. 42
U.S.C. § 1382c(a)(3)(A); Plummer, 186 F.3d at 427. A claimant
lacks the ability to engage in any substantial gainful activity
"only if his physical or mental impairment or impairments are of
such severity that he is not only unable to do his previous work
but cannot, considering his age, education, and work experience,
engage in any other kind of substantial gainful work which
exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B);
Plummer, 186 F.3d at 427-28.

     The Commissioner reviews disability claims in accordance
with a five-step process set forth in 20 C.F.R. § 404.1520. In
step one, the Commissioner must determine whether the claimant
is currently engaged in "substantial gainful activity." 20
C.F.R. § 1520(b). If the answer is yes, the disability claim

20

will be denied. See Bowen v. Yuckert, 482 U.S. 137, 140 (1987). In step two, the Commissioner must determine whether the claimant is suffering from a "severe impairment," defined as an impairment "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 1520(c). A claimant who cannot claim a "severe" impairment is ineligible for benefits. Plummer, 186 F.3d at 428.

Step three requires the Commissioner to compare the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful activity. 20 C.F.R. § 1520(d). If a claimant suffers from a listed impairment or its equivalent, she is approved for disability benefits and the analysis stops. If she does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five to determine whether the she retains the ability to engage in substantial gainful activity. Plummer, 186 F.3d at 428.

The Commissioner conducts a residual functional capacity ("RFC") assessment at steps four and five. The RFC assessment considers all of the claimant's medically determinable impairments and determines the most the claimant can still do despite her limitations. 20 C.F.R. § 404.1545(a)(1)-(2). At step four, the Commissioner compares the RFC to the physical and mental demands of the claimant's past relevant work to determine

whether she can resume her former occupation. 20 C.F.R. §
404.1520(f). If the claimant is capable of performing her past
job, she is not disabled. If she is unable to resume her former
occupation, the Commissioner will then proceed to the final step
and decide whether the claimant is capable of performing other
work existing in significant numbers in the national economy,
taking into account her RFC and vocational factors such as age,
education, and work experience. 20 C.F.R. §§ 404.1520(g),
404.1560(c).

> **B. The ALJ's determination that Plaintiff's mental disorders
> and ankle disorder were non-severe is supported by
> substantial evidence**

At step two of the five-step process, the Commissioner
determines whether the claimant suffers from an impairment or
combination of impairments that is "severe." Under the Social
Security regulations, an impairment is severe "if significantly
limits your physical or mental ability to do basic work
activities." 20 C.F.R. § 404.1520(c). The regulations define
"basic work activities" as "the abilities and aptitudes
necessary to do most jobs," which include, *inter alia*,
"[p]hysical functions such as walking, standing, sitting,
lifting, pushing, pulling, reaching, carrying, or handling." 20
C.F.R. § 404.1521(b). Like any other step in the sequential
analysis, a determination at step two will be upheld if it is
supported by substantial evidence on the record as a whole.

22

McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360-61 (3d Cir. 2004).

Plaintiff argues that the ALJ erred when it concluded at step two that Plaintiff's ankle disorder and affective disorders were not severe. Specifically, the ALJ found that these impairments "do not cause more than minimal limitation" to Plaintiff's ability to perform basic physical and mental work activities. (R. at 104-05.) The Court agrees with the ALJ's determination.

First, the record supports the ALJ's finding that Plaintiff's mental impairments were not severe. The ALJ evaluated Plaintiff's mood disorders under four functional areas pursuant to the disability regulations and explained that Plaintiff's mental impairments caused no more than mild limitations in three functional areas (activities of daily living; social functioning; concentration, persistence, or pace) and no limitation in the fourth (decompensation). (R. at 105.) The ALJ's finding was substantially supported by the record. While Dr. Goldberg noted that Plaintiff was "fairly emotional" when speaking about painful experiences, Plaintiff had also reported to him that she was not depressed during the day when she takes care of children and that she had happiness in her life. She also stated that her life was "fairly busy." (R. at 337-38.) He noted that with respect to work, Plaintiff's

difficulties were medical, not psychiatric. (R. at 338.) At the hearing, Plaintiff testified that she does not avoid people and was not prescribed medication for her anxiety or depression, and that she gets up at 8 on most mornings. The ALJ also took into account the fact that Plaintiff had a very limited psychiatric history and for the most part had not had psychiatric treatment, which lends further support for his conclusion that Plaintiff's condition was not severe. (R. at 105.)

Plaintiff argues that the ALJ erred in assigning little weight to the evaluations of Dr. Shapiro and Dr. Gara, both of whom opined, based on a review of Plaintiff's medical history and Dr. Goldberg's report, that Plaintiff had mild restrictions to activities of daily living and social functioning, and was limited to unskilled work. (Pl. Br. [Docket Item 13] at 22.) The Court notes that when a conflict in the evidence exists, the ALJ retains significant discretion in deciding whom to credit. Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999); see also Brown v. Astrue, 649 F.3d 193, 196 (3d Cir. 2011) (noting that "the ALJ is entitled to weigh all evidence in making its finding" and the ALJ is not required to accept the opinion of any medical expert). However, the ALJ "must consider all the evidence and give some reason for discounting the evidence she rejects." Plummer, 186 F.3d at 429; see also Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008).

24

This Court's role is not to re-weigh the evidence, but to determine whether substantial evidence supports the ALJ's decision to assign little weight to the opinions of Dr. Shapiro and Dr. Gara. See Gantt v. Comm'r Soc. Sec., 205 F. App'x 65, 67 (3d Cir. 2006) ("[O]ur role is not to weigh the evidence; our role on review is limited to determining whether substantial evidence supports the ALJ's denial of disability benefits."). Here, the ALJ was correct to point out that the opinions of Dr. Shapiro and Dr. Gara were unsupported by the record, since nothing in the record suggested that Plaintiff's mental disorder limited her social functioning or her daily activities. Indeed, Dr. Goldberg explicitly noted that Plaintiff likes to be with people, has no problem with her temper, spends time with her boyfriend, takes care of her children during the day, and keeps up with the house and with running her daycare center. (R. at 337-38.) Plaintiff reported that she was limited in what she did around the house, but explicitly stated that the limitations were due to her pain, not her mood. (R. at 337.) The ALJ therefore properly found that Plaintiff's mental impairment was not severe.

The Court also finds no error in the ALJ's determination that Plaintiff's ankle disorder was not severe. Plaintiff notes that Dr. McMillian diagnosed Plaintiff with chronic right ankle sprain and Plaintiff reported experiencing several falls and

25

having "persistent instability" in her ankle. The ALJ
acknowledged Plaintiff's statements about having frequent falls
and instability in her ankle, but noted that other medical
records did not reveal any instability in Plaintiff's ankle and
showed normal gait, full motor strength, and full range of
motion. Indeed, Dr. Buono, who evaluated Plaintiff in May 2013,
observed that Plaintiff had 5/5 strength in all muscle groups in
her lower extremities. Similarly, Dr. Maslow reported that
Plaintiff had normal balance and gait and was able to stand on
her toes and heels, had a normal range of motion in both ankles,
intact reflexes, and normal strength testing results. (R. at
330-31.)[1] The ALJ noted Dr. Maslow's conclusion that there was no
evidence of instability at Plaintiff's ankles. (Id.) Finally,
the ALJ took into consideration the fact that Plaintiff did not
seek emergency room treatment for her falls. (R. at 104.) Based
on the above, the ALJ concluded that, despite some instability
in Plaintiff's ankle which contributed to her falls, the medical
evidence did not establish that Plaintiff's ankle disorder was
severe. The Court finds that the ALJ's determination – that

---

[1] Plaintiff cites to Dr. McMillian's March 2013 report, which
noted that Plaintiff has hypermobility with supination, soft
tissue swelling, and a decreased range of motion in her right
ankle. (Pl. Br. at 18.) However, Dr. McMillian had examined
Plaintiff just a little over a week after Plaintiff had "rolled
her ankle," and there is no evidence in the record that these
functional limitations associated with her rolled ankle are
permanent.

Plaintiff's ankle disorder does not "significantly limit" her ability to do basic work activities – is supported by substantial evidence.[2]

The Court notes that even if the ALJ failed to appropriately qualify Plaintiff's affective disorders and ankle disorder as severe, under-inclusion at step two constitutes harmless error. See, e.g., Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 149 n. 2 (3d Cir. 2007) ("Because the ALJ found in [Plaintiff]'s favor at Step Two, even if he had erroneously concluded that some of h[is] other impairments were non-severe, any error was harmless."); Barlow v. Comm'r of Soc. Sec., Civ. 13-538, 2014 WL 1225560, at *7 (D.N.J. Mar. 24, 2014) ("[A]ny error at step two was harmless because the ALJ continued the sequential analysis."). The ALJ is required to consider the cumulative effect of all impairments Plaintiff suffers from, regardless of the severity, in the remainder of its analysis. See 20 C.F.R. § 404.1523. Here, because the ALJ found that some of Plaintiff's impairments were severe and continued onto step four of the analysis to make the RFC assessment, any error at step two was harmless.

_____

[2] Although the ALJ did not err in finding Plaintiff's ankle disorder non-severe, the record nonetheless showed that Plaintiff had some functional limitations to her ankle. As will be discussed below, the Court finds that the ALJ failed to take into account the impairments caused by Plaintiff's ankle disorder in the RFC analysis.

**C. The ALJ considered Plaintiff's affective disorders but did did not properly consider Plaintiff's ankle disorder in the RFC assessment**

Steps four and five of the disability determination require the ALJ to make an assessment of the claimant's residual functional capacity ("RFC"). 20 C.F.R. § 404.1520. The RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000) (quoting Hartranft v. Apfel, 181 F.3d 358, 359 n.1 (3d Cir. 1999)). To determine a claimant's RFC, the ALJ considers how limitations to a claimant's physical abilities, mental abilities, and any other abilities might affect the claimant's capacity to do work on a regular and continuing basis. 20 C.F.R. § 404.1545(b)-(d). The ALJ must "consider the combined effect of all of [a claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523; see also SSR 96-8P, 1996 WL 374184, at *5 (S.S.A. July 2, 1996). Such evidence includes medical records, lay evidence, effects of symptoms, including pain that are reasonably attributed to a medically determinable impairment, descriptions and observations of limitations by the claimant and others. 20 C.F.R. § 404.1545(a)(3). Additionally, the ALJ's findings of residual functional capacity must "be accompanied by a clear and

satisfactory explanation of the basis on which it rests."
Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2001) (quoting
Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)).

Plaintiff does not argue that the RFC assessment of "light
work" is unsupported by substantial evidence. Plaintiff contends
that it is impossible for her to meaningfully review and
challenge the ALJ's RFC determination because the ALJ failed to
perform a function-by-function analysis. (Pl. Br. at 15.)[3]
Rather, she argues that the ALJ erred by not taking Plaintiff's
ankle disorder and affective disorders into account in making
the RFC determination. (Pl. Br. 17, 22.)

The Court first finds that the ALJ properly considered
Plaintiff's mental impairment in determining the RFC. In
assessing Plaintiff's mental residual functional capacity, the
ALJ examined the reports of Dr. Shapiro and Dr. Gara. As already
discussed above, he assigned those reports little weight because
Plaintiff does not receive mental health treatment, does not
take any psychiatric medication, and was only in therapy at Twin
Oaks for one month. (R. at 109.) The ALJ also discussed at
length the results of Dr. Goldberg's psychiatric examination.
The ALJ noted that Plaintiff had reported a very limited
psychiatric history and for the most part had not had

---

[3] The Court addresses this argument in section IV.E.

psychiatric treatment. (R. at 109.) He pointed out that that Dr. Goldberg had reported Plaintiff's thought processes as lucid, logical, and goal directed. Although Plaintiff reported having panic attacks once or twice a week, the ALJ also noted Plaintiff's statements that she tends to be a calm person most of the time, has no problems with her temper, and is not suicidal, compulsive, or psychotic. (Id.)

Plaintiff argues that the ALJ improperly considered the fact that Plaintiff is depressed because of her pain, and contends that the "cause of Plaintiff's depression is not at issue, but rather the functional limitations that depression imposes." (Pl. Br. at 22.) The ALJ's comment was not improper, since Dr. Goldberg's opinion was that with respect to the limitations in her daily activities, "[Plaintiff's] difficulties are medical, not psychiatric." (R. at 109, 338.) In other words, the functional limitations alleged by Plaintiff were not caused by her depression or other mood disorder, but by physical difficulties. (R. at 109.) The ALJ's statement is thus relevant to the question of whether and to what extent Plaintiff's affective disorder limits her ability to perform daily activities. The ALJ's discussion of Plaintiff's anxiety and depression as part of the RFC determination is well-explained and supported by substantial evidence.

The Court holds, however, that the ALJ did not properly consider the medical record for Plaintiff's ankle disorder in the RFC assessment. Here, although the ALJ referenced most of the relevant medical record, he ignored or discounted portions of the record without explanation. In reviewing Plaintiff's testimony at the hearing, the ALJ acknowledged Plaintiff's reports of difficulty walking, sitting, kneeling, and climbing stairs, but did not make any reference to Plaintiff's statements about her ankle problems, which Plaintiff mentioned several times throughout the hearing. Plaintiff testified, for example, that her right ankle sometimes becomes weak and she will fall, and that she has fallen on her right ankle twice and her left foot once. (R. at 130-31.) She also reported having tingling and numbness in her feet, which she believes contributes to her problems falling. (R. at 126-27.) Plaintiff noted that she suffers from ankle pain every day, and needs to hold onto something when she walks up and down stairs. (R. at 131.) She testified that she starts to feel pain in her ankle within 10 to 20 minutes of walking. (R. at 131.) The ALJ's summary of Plaintiff's testimony made no note of these alleged limitations.

Moreover, while the ALJ correctly summarized the opinions of Dr. Maslow and Dr. Buono, he failed to note the diagnosis of antalgic gait and chronic right ankle sprain from Dr. McMillian. (R. at 357, 383.) Nor did he examine Plaintiff's physical

therapy records, which discuss Plaintiff's ankle instability in
detail. The ALJ appeared to misstate the information contained
in Plaintiff's physical therapy record, stating that Plaintiff
"reported no falls and no difficulty with her activities of
daily living, including showering, cooking, and standing
activities of daily living." (R. at 108.) The ALJ cites to a
Strive Physical Therapy summary dated November 12, 2012, but
that document actually states that Plaintiff "has no report of
falls since starting PT," not that Plaintiff reported no falls
at all. (R. at 352.) The record also states that Plaintiff
reported no change with performing showering, cooking, and
standing activities, not that Plaintiff reported no difficulty
with performing those activities. (Id.) An earlier record from
October 9, 2012, makes clear that Plaintiff had in fact
specifically noted problems with showering, cooking, and
standing. (R. at 407.) Thus, the statement in the November 12,
2012 report meant that Plaintiff continued to have those
problems, even after a month of physical therapy.

While the ALJ cited to the November 12, 2012 summary of
Plaintiff's physical therapy progress, he made no mention of the
fact that Plaintiff then "rolled her ankle" and attended
physical therapy a second time in April of 2013, nor did he cite
to any records from those sessions. Those records reveal that at
the initial visit, Plaintiff reported difficulty with "standing,

walking, performing stairs and performing ADLs such as shopping and driving." (R. at 392.) Contrary to the ALJ's assertion, the record also explicitly notes that Plaintiff had reported two falls in the past year. (R. at 394.) Treatment notes from later in April indicate that Plaintiff continued to have some strength and balance deficits on her right side due to some weakness in the muscles of the ankle, which "limit her ability to ambulate specially on uneven surfaces" as well as her ability to ascend and descend stairs without difficulty. (R. at 403, 405.) These treatment records were never addressed by the ALJ.

The ALJ "must consider all the evidence and give some reason for discounting the evidence she rejects." Plummer, 186 F.3d at 429; see also Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000) (ALJ's failure to mention contradictory medical evidence was error). Here, although the ALJ discussed some medical records indicating that there were no severe impairments to Plaintiff's ankle, he failed to acknowledge other evidence which suggested that Plaintiff had at least some functional limitations due to her ankle. The Court will therefore remand the case to the Commissioner of Social Security to reconsider Plaintiff's request for disability insurance benefits. On remand, the ALJ should consider in particular the medical records from Strive Physical Therapy to determine whether Plaintiff's ankle disorder creates any

33

limitations on Plaintiff's ability to do work on a continuing
and regular basis.

### D. The ALJ properly accounted for Plaintiff's vertigo and impairments to her upper extremities in the RFC assessment.

Plaintiff next argues that the ALJ also failed to consider
Plaintiff's vertigo and upper extremity impairments in the RFC
assessment.[4] The Court disagrees. First, with respect to
Plaintiff's upper extremity impairments, the ALJ acknowledged
Plaintiff's statements that she has someone carry her laundry
basket up and down the stairs and takes breaks while cleaning.
(R. at 107.) He also recounted Plaintiff's testimony that she
has difficulty lifting, reaching, and using hands, and has
difficulty sleeping due to pain. (Id.) The ALJ noted, however,
that in a May 2013 physical examination by Dr. Buono, Plaintiff
showed full motor strength in her upper extremity despite having
decreased reflexes and pin sensation in the left upper
extremity. (Id.) Contrary to Plaintiff's contention, the ALJ
specifically acknowledged that Plaintiff had complained of
numbness and tingling in her hands. (R. at 108.) The ALJ then
noted that Plaintiff's medical exams were generally normal. Dr.
Maslow's exam revealed that Plaintiff's shoulders and upper

---

[4] Plaintiff does not argue that the ALJ improperly characterized
her upper extremity impairment and vertigo as non-severe
impairments.

extremities were normal and Plaintiff exhibited a full range of motion with no evidence of instability. (R. at 108.) A vertex compression test was performed and was negative for radicular signs and symptoms; an Adson's maneuver was also negative; and overhead testing was negative for thoracic outlet impingement signs and symptoms. (Id.) The ALJ also noted that Plaintiff's neurological exam of the upper extremities was normal and that her grip strength was excellent bilaterally. (Id.) Consistent with the evidence in the record, the ALJ noted that Plaintiff was able to go outside every day, drive a car, shop for groceries, make meals for herself, and take care of an infant and a toddler and her dog. (R. at 107.) Thus, the ALJ concluded that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not supported by the medical record. (Id.) The Court finds that the ALJ properly included Plaintiff's upper extremity impairments in the RFC assessment.

Similarly, the ALJ did not err in failing to consider Plaintiff's vertigo. "[T]he ALJ need only include in the RFC those limitations which he finds credible." Garrett v. Comm'r of Soc. Sec., 274 Fed. App'x 159, 163 (3d Cir. 2008) (citing Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000)). Here, although Plaintiff complained of feeling dizzy and having bouts of vertigo at the ALJ hearing,

35

Plaintiff's allegation of having vertigo was not confirmed by any other portion of the record. She did not report feeling dizzy or having vertigo to Dr. Maslow, nor did she report any symptoms to other doctors who examined her. Plaintiff argues that she reported having unsteadiness and balance defects to her physical therapist, which the ALJ ignored, but these symptoms appear to have been attributed to problems with her ankle. For example, the physical therapy treatment notes from April 11, 2013, state that Plaintiff "continues to have weakness t/o R ankle musculature which cont to limit her balance with standing and walking activities." (R. at 399.) Treatment notes from April 15, 2013 similarly state that Plaintiff "cont to have strength deficits t/o R ankle musculature and R LE which cont to limit her balance with static and dynamic activities and limit her ability to perform activities such as stairs and ambulation on uneven surfaces." (R. at 400.) Treatment notes from April 18th, April 23rd, and April 25th also indicate that Plaintiff's balance deficits were related to weakness in her ankle. In an October 9th, 2012 physical therapy session, the treatment notes state that Plaintiff "denies any c/o dizziness or spinning" when she falls. (R. at 407) ("She reports she doesn't get dizzy when she falls, she just drops."). None of the physical therapy treatment records mention that Plaintiff's symptoms may be

related to vertigo.[5] The Court finds that the ALJ did not err in failing to consider Plaintiff's vertigo in the RFC assessment. See Garrett, 274 Fed. App'x at 163 (ALJ properly omitted from the RFC analysis limitations he found less than credible).

### E. The ALJ erred in failing to perform a function-by-function RFC assessment

Social Security Ruling 96-8p states that the RFC "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." SSR 96-8p, 1996 WL 374184, at *1. The functions that must be addressed include the physical functions of sitting, standing, walking, lifting, carrying pushing, and pulling. Id. at 5. SSR 96-8p further notes that in the RFC assessment, each function "must be considered separately (e.g., 'the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours,') even if the final RFC assessment will combine activities." Id. "Only after the function-by-function analysis may the ALJ express the RFC in terms of the exertional levels of work." Id. at *1.

---

[5] Although Plaintiff was evaluated by Dr. Shah for vertigo, Dr. Shah concluded that Plaintiff's examination was within normal limits. He stated that the "otologic portion of the balance test was normal. The vestibular function was not indicated. There was no significant issue with the ocular motor function." (R. at 419.) Moreover, Dr. Shah attributed Plaintiff's issues with postural stability to neuromuscular weakness. (Id.)

After reviewing the medical record, the ALJ concluded that "the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b)." (R. at 106, 108.)[6] The ALJ did not specify any limitations to Plaintiff's capacity for light work. Plaintiff argues that the ALJ erred in not performing a function-by-function analysis of her exertional limitations, as required by SSR 96-8p. She argues that the ALJ "completely failed to address the exertional limitations of sitting, standing, walking, lifting, and carrying." (Pl. Br. at 13.) Plaintiff contends that had the ALJ conducted a function-by-function analysis and found that Plaintiff had an RFC more closely approximating sedentary work, she would have been considered disabled under the Medical-Vocational Guidelines set forth in 20 C.F.R. Part 404, Subpart P, Appendix 2. Plaintiff argues that it is impossible to meaningfully review the ALJ's RFC determination because the ALJ stated only that Plaintiff's RFC was for a full range of light work. (Id.)

The Court agrees with Plaintiff that the ALJ's failure to perform a function-by-function analysis was error. Although the ALJ examined the medical record and noted certain observations

---

[6] "Light work" involves mostly walking and standing, frequently lifting and carrying items that weigh up to ten pounds, and occasionally lifting and carrying items that weigh up to twenty pounds. 20 C.F.R. § 404.1567(b). A job is also considered light work if the individual sits most of the day but operates arm or leg controls. Id.

by Plaintiff's doctors about Plaintiff's ability to sit, stand, walk, and reach overhead, he did not specifically address each function listed in SSR 96-8p, nor did he make any explicit finding as to whether Plaintiff had any limitations to these functions. The ALJ also failed to state the specific amount of time that Plaintiff could perform each function during an eight hour workday.

The absence of a function-by-function analysis was particularly noticeable here, since the record suggests that Plaintiff may have had some limitations which the ALJ failed to consider or address. For example, Plaintiff testified at the hearing that she can only lift and carry a five pound bag, but nowhere did the ALJ address Plaintiff's statement. (R. at 142.) Nor did the ALJ address Plaintiff's statement that she can only walk for a block before getting a sharp pain in her ankle, or that she feels like she is about to fall when she's standing. (R. at 130-31.) As discussed above, physical therapy records and Plaintiff's testimony at the hearing also indicate that Plaintiff's ankle presented problems of instability and pain, resulted in falls, and interfered with Plaintiff's ability to walk, stand, and climb stairs, but the ALJ misread the physical therapy records as stating that Plaintiff had no difficulty with activities of daily living. Because the ALJ erred in not evaluating all of the medical evidence, particularly with

39

respect to Plaintiff's ankle, the Court does not agree with Defendant that the ALJ's failure to perform a function-by-function analysis was harmless. See Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122-23 (3d Cir. 2000) (court cannot assess whether ALJ's RFC determination was supported by substantial evidence where ALJ erred in not evaluating all of the medical evidence).

The Court will therefore remand this case to the Commissioner of Social Security to determine Plaintiff's RFC on a function-by-function basis, in accordance with SSR 96-8p. Remand is particularly appropriate here since the record suggests that Plaintiff had limitations to physical functions that could clearly affect her exertional category. The "light work" category "generally requires the ability to stand and carry weight for approximately six hours of an eight hour day." Jesurum v. Sec'y of U.S. Dep't of Health & Human Serv., 48 F.3d 114, 119 (3d Cir. 1995). By contrast, the "sedentary work" category generally requires no more than two hours of standing or walking out of an eight hour day, and requires lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. See SSR 83-10, 1983 WL 31251, at *5-6. Plaintiff's status may very well change once all of her functional limitations are considered in the RFC.

On remand, the ALJ should adhere to the requirements outlined in SSR 96-8p. In particular, the ALJ should examine whether Plaintiff's ankle disorder creates any functional limitations on Plaintiff's ability to sit, stand, and walk. The ALJ should also examine whether Plaintiff's disorder of the lumbar and cervical spine, combined with any impairment to her upper extremity, creates any limitations on pushing, pulling, lifting, and carrying. In accordance with SSR 96-8p, the ALJ should also state the specific amount of time that Plaintiff can perform each function during an eight hour workday. See SSR 96-8p, 1996 WL 374184, at *7 (ALJ "must discuss the individual's ability to perform sustained work activities" on a regular work schedule of 8 hours a day, 5 days a week, and "describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record."); Pearson v. Barnhart, 380 F. Supp. 2d 496, 507-08 (D.N.J. 2005) (ALJ's failure to state the amount of time the plaintiff was able to perform each function during an eight hour day, as specified by SSR 96-8p, was error and required remand).[7]

_____

[7] Because this case will be remanded to the ALJ for a new RFC determination, the Court need not reach the question of whether the ALJ's misstatement about the vocational expert's testimony was error. (Pl. Br. at 16.) Upon remand, the ALJ may call a new vocational expert to testify about Plaintiff's ability to perform past relevant work based on a new RFC assessment. The Court notes only that any hypothetical posed to the vocational expert must "accurately portray" all of the physical and mental

**V. CONCLUSION**

     For the foregoing reasons, the Court will vacate the ALJ's decision and remand for reconsideration consistent with this opinion. An accompanying Order will be entered.


<u>**June 22, 2015**</u>                     <u>**s/ Jerome B. Simandle**</u>
Date                                 JEROME B. SIMANDLE
                                       Chief U.S. District Judge

---

impairments that are supported by objective medical findings in the record. <u>Podedworny v. Harris</u>, 745 F.2d 210, 218 (3d Cir. 1984); <u>see</u> <u>also</u> <u>Ramirez v. Barnhart</u>, 372 F.3d 546, 552 (3d Cir. 2004). Medically supported limitations that are not included in the hypothetical posed to the vocational expert will preclude reliance on the expert's response. <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 554 (3d Cir. 2005).